No. 14-1341

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

### APRIL DEBOER, *et al.*,

### PLAINTIFFS-APPELLEES

### v.

### RICHARD SNYDER, *et al.*,

### DEFENDANTS-APPELLANTS

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## No. 2:12-cv-10285-BAF-MJH (Hon. Bernard A. Friedman)

---

## MOTION OF TRADITIONALIST YOUTH NETWORK, LLC, FOR LEAVE
## TO PARTICIPATE AS *AMICUS CURIAE*

---

**BRISTOW LAW, PLLC**
Kyle J. Bristow, Esq.
P.O. Box 1954
Clarkston, MI 48347
(P):  (567) 694-5953
(E):  BristowLaw@gmail.com
(W):  www.KyleBristow.com
Ohio S. Ct. #0089543
Mich. State Bar #P77200
*Lead Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

**THE VAN DYKE LAW FIRM, PLLC**
Jason Van Dyke, Esq.
200 Chisholm Pl., #250
Plano, TX 75075
(P):  (469) 964-5346
(F):  (972) 421-1830
(E):  jason@vandykelawfirm.com
(w):  www.vandykelawfirm.com
Tex. State Bar #24057426
*Co-Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

# I.  INTRODUCTION

Pursuant to Fed. R. App. P. 29, the Traditionalist Youth Network, LLC, hereby respectfully moves for leave to file the attached brief as *amicus curiae* in support of Defendants-Appellants.  This motion is accompanied by the Traditionalist Youth Network, LLC's proposed brief as is required by Fed. R. App. P. 29(b).

# II.  ARGUMENT

## A.  Traditionalist Youth Network, LLC's Interests

The Traditionalist Youth Network, LLC, is a limited liability corporation existing by and through the laws of the State of Michigan, and it is nationally recognized as a staunch advocate of traditionalism.  Its members have engaged in political discourse and have promoted traditionalism by publishing commentary on the organization's website—www.TradYouth.org—, by organizing and participating in public demonstrations, and by being invited to and speaking at events organized by other similarly-minded organizations.

Even though the Traditionalist Youth Network, LLC, was only founded as recently as July of 2013, it has quickly become one of the fiercest defenders of traditional values in the United States of America—its members have appeared in televised national news stories and people throughout the country have expressed an interest in creating chapters of the organization in their own states.

In short, the Traditionalist Youth Network, LLC, is to the United States of America what Génération Identitaire is to France: it is an extremely active pro-European socio-political identity movement that was founded and is controlled by concerned and well-informed young activists.

As an organization that vigorously advocates traditionalism, the Traditionalist Youth Network, LLC, strongly opposes any attempt to usurp the sanctity of marriage through the debasement of this ancient artifact of Western civilization. As such, the Traditionalist Youth Network, LLC, would like to submit the attached *amicus curiae* brief to support the appellants who will argue that Michigan's ban on same-sex marriage is constitutional and that the district court's judgment should be reversed as a matter of law.

### B. Reasons Why An *Amicus Curiae* Brief From Traditionalist Youth Network, LLC, Is Desirable And Relevant To The Disposition Of The Case

The Traditionalist Youth Network, LLC's *amicus curiae* brief is both relevant and desirable. *See* Fed. R. App. P. 29(b)(2).

When it comes to the Traditionalist Youth Network, LLC, its mission is tradition, and since the district court's opinion is an affront to thousands of years of the Western legal tradition and hundreds of years of the American legal tradition, the Traditionalist Youth Network, LLC, believes that it is critically important for its organization to become involved in the case by way of it submitting an *amicus curiae* brief to support the appellants.

An *amicus curiae* brief from the Traditionalist Youth Network, LLC, is desirable insofar as the brief argues that government—in accordance with its inherent police power—has a legitimate state interest to regulate marriage, and that the State of Michigan's ban on same-sex marriage is rationally related to said interest.

Although the appellants are expected to make somewhat similar arguments in the instant appeal, the Traditionalist Youth Network, LLC's brief is desirable and relevant to the disposition of the case insofar as it presents its argument by extrapolating and analyzing ancient and traditional legal principles by exploring the history of Western and American civilization. In short, the Traditionalist Youth Network, LLC's brief presents an originalist argument that could very well be omitted from the briefs of the parties to this case since it is vogue for litigants to either be politically correct and avoid the real issues or to cite modernist pseudo-science and easily distinguishable case law based on postmodern sentiment to argue that social engineering is required—and not just permitted—by the United States Constitution.

As was said by one learned individual, "Most contemporary scholars, whether they call themselves 'originalists' or not, believe that constitutional meaning should be derived, at least in part, from the understanding of those who framed and ratified the constitutional text." David Yaskky*, The Second*

*Amendment:  Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588, 593 (2000).

While the appellants will likely not say it as bluntly as this, the Culture distorters and those who espouse their ideals flagrantly reject originalism and often treat the United States Constitution like an accordion:  they frequently stretch it out to invent rights that do not exist—such as the "right" to have an abortion or the "right" to engage in sodomy or the "right" to view pornographic materials—, and they constrict it to not mean things that it certainly does—such as by denying the plain language of the Second Amendment to the United States Constitution.

In essence, the Traditionalist Youth Network, LLC, would like to submit its *amicus curiae* brief to set things straight.

## III.  CONCLUSION

For the reasons set forth *supra*, the Traditionalist Youth Network, LLC, respectfully requests that this Court will grant its motion to file the attached *amicus curiae* brief.

Respectfully submitted,

/s/ Kyle J. Bristow
Kyle J. Bristow, Esq.
Bristow Law, PLLC
P.O. Box 1954
Clarkston, MI 48347
(P):  (567) 694-5953
(E):  BristowLaw@gmail.com

4

Ohio S. Ct. #0089543
Mich. State Bar #P77200
*Lead Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

Dated:  March 25, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2014, the foregoing Motion of Traditionalist Youth Network, LLC, for Leave to Participate as *Amicus Curiae* was electronically filed throughout the Court's CM/ECF system, which should be sent to all registered parties by operation of said electronic filing system.

/s/ Kyle J. Bristow
Kyle J. Bristow, Esq.
Bristow Law, PLLC
P.O. Box 1954
Clarkston, MI 48347
(P):  (567) 694-5953
(E):  BristowLaw@gmail.com
Ohio S. Ct. #0089543
Mich. State Bar #P77200
*Lead Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

No. 14-1341

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

**APRIL DEBOER, *et al*.,**

**PLAINTIFFS-APPELLEES**

**v.**

**RICHARD SNYDER, *et al*.,**

**DEFENDANTS-APPELLANTS**

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN
### No. 2:12-cv-10285-BAF-MJH (Hon. Bernard A. Friedman)

---

### *AMICUS CURIAE* BRIEF OF TRADITIONALIST YOUTH NETWORK, LLC, IN SUPPORT OF APPELLANTS AND URGING REVERSAL

---

**BRISTOW LAW, PLLC**
Kyle J. Bristow, Esq.
P.O. Box 1954
Clarkston, MI 48347
(P):  (567) 694-5953
(E):  BristowLaw@gmail.com
(W):  www.KyleBristow.com
Ohio S. Ct. #0089543
Mich. State Bar #P77200
*Lead Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

**THE VAN DYKE LAW FIRM, PLLC**
Jason Van Dyke, Esq.
200 Chisholm Pl., #250
Plano, TX 75075
(P):  (469) 964-5346
(F):  (972) 421-1830
(E):  jason@vandykelawfirm.com
(w):  www.vandykelawfirm.com
Tex. State Bar #24057426
*Co-Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 14-1341                    Case Name: Deboer, et al., v. Snyder, et al.

Name of counsel: Kyle J. Bristow

Pursuant to 6th Cir. R. 26.1, Traditionalist Youth Network, LLC

*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No.

### CERTIFICATE OF SERVICE

I certify that on _____ March 25, 2014 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Kyle J. Bristow

_____

_____

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... i

STATEMENT OF IDENTITY AND INTEREST OF THE TRADITIONALIST
YOUTH NETWORK, LLC .....................................................................1

SUMMARY OF ARGUMENT ................................................................2

STATEMENT OF FACTS .......................................................................2

ARGUMENT ...........................................................................................3

   I.   THE DISTRICT COURT ERRED BY HOLDING THAT THE STATE OF
MICHIGAN'S BAN ON SAME-SEX MARRIAGE DOES NOT SATISFY
RATIONAL BASIS REVIEW. ............................................................4

    A.  The State Of Michigan Has A Legitimate State Interest To Ban Same-Sex
Marriage. ...........................................................................................5

       1.    The State Of Michigan's Ban On Same-Sex Marriage Is In Accordance
With the Western Legal Tradition. ..............................................14

       2.    The State Of Michigan's Ban On Same-Sex Marriage Is In Accordance
With The American Legal Tradition. ...........................................21

    B.  The State Of Michigan's Ban On Same-Sex Marriage Is Rationally Related
To The Legitimate State Interest To Ban Same-Sex Marriage. ........24

CONCLUSION .......................................................................................25

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a) .....27

CERTIFICATE OF SERVICE ...............................................................28

# TABLE OF AUTHORITIES

## Statutory Law

Fourteenth Amendment to the United States Constitution          3-6, 11, 13, 25

Mich. Const. Art. I, § 25 ................................................................................... 2, 5, 24

## Case Law

*Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed*,
    409 U.S. 810 (1972) .................................................................................. 13-14

*Bowers v. Hardwick*, 478 U.S. 186 (1986) ............................. 3, 5, 8-9, 12, 15-16, 22

*Clark v. Jeter*, 486 U.S. 456 (1988) ........................................................................ 5

*Davis v. Prison Health Servs.*, 679 F.3d 433 (6th Cir. 2012) .................................... 5

*Ephraim v. State*, 89 So. 344 (Fla. 1921) ............................................................... 24

*Ex parte H.H.*, 830 So. 2d 21 (Ala. 2002) ........................................................ 15, 24

*Federal Communications Commission v. Beach Communications,
    Inc.*, 508 U.S. 307 (1993) ............................................................................... 5

*Griswold v. Connecticut*, 381 U.S. 479 (1965) ...................................................... 10

*Heller v. Doe*, 509 U.S. 312 (1993) ...................................................................... 11

*Hicks v. Miranda*, 422 U.S. 332 (1975) ................................................................ 14

*Jackson v. Abercrombie*, 884 F.Supp.2d 1065 (D.Hawai'i 2012) ........................... 14

*Korematsu v. United States*, 323 U.S. 214 (1944) .................................................... 4

*Lawrence v. Texas*, 539 U.S. 558 (2003) .................................... 3, 5-8, 12, 22, 25

*Maynard v. Hill,* 125 U.S. 190 (1888) ................................................................... 13

*Michael H. v. Gerald D.*, 491 U.S. 110 (1998)...................................................... 10

*Moore v. East Cleveland*, 431 U.S. 494 (1977)........................................................11

*Scarborough v. Morgan County Bd. of Educ.*, 470 F.3d 250 (6th Cir. 2006)............ 5

*Sevcik v. Sandoval*, 911 F.Supp.2d 996 (D.Nev. 2012)..................................... 11-13

*Smelt v. County of Orange*, 374 F.Supp.2d 861 (C.D.Cal. 2005).......................... 14

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938)................................ 5

## Secondary Sources

Bork, Robert.  *Slouching Towards Gomorrah:  Modern Liberalism and American Decline*.  New York City:  ReganBooks/HarperCollins Publishers, Inc., 2003......................................................................... 6-7

Brief for the Center for the Original Intent of the Constitution Supporting Respondent, Lawrence v. Texas, 539 U.S. 558 (2003) (No. 02-102)................ 23

Brief for Concerned Women for American Education and Legal Defense Foundation as Amici Curiae Supporting Petitioners, Bowers v. Hardwick, 478 U.S. 186 (1986) (No. 85-140).................................................... 23

Chemerinsky, Erwin. *Constitution Law*. Third ed. New York City: Aspen, 2009.................................................................................................... 9

Frakes, Robert.  Why the Romans Are Important in the Debate About Gay Marriage.  History News Network.  <http://hnn.us/articles/21319.html>. Accessed 5 March 2011.............................................................. 16-18

Jefferson, Thomas. *The Founders' Constitution, Volume 5, Amendment VIII, Document 10*.  <http://press-pubs.uchicago.edu/founders/documents/amendVIIIs10.html>. Accessed 5 March 2011...................................................................... 22

Schlafly, Phyllis. *The Supremacists:  The Tyranny of Judges and How to Stop It*.  Dallas, Texas:  Spence Publishing Company, 2006........................7

Steakley, Jim.  *Timeline of German LGBT History*.
    <http://www.gsaforsafeschools.org/history/German_TL_Student_
    Teach.pdf>.  Accessed 5 March 2011.........................................................19-21

Steven Calabresi and Sarah Agudo.  "Individual Rights Under State
    Constitutions when the Fourteenth Amendment Was Ratified in 1868:
    What Rights Are Deeply Rooted in American History and Tradition?"
    87 Tex. L. Rev. 7 (2008).................................................................... 10

Tacitus.  *Germania*.
    <http://www.perseus.tufts.edu/hopper/text?doc=Tac.+Ger.+12&fromdoc
    =Perseus%3Atext%3A1999.02.0083>.  Accessed 8 May 2010..................... 19

Timeline of Homosexuality.  Religion Facts.
    <http://www.religionfacts.com/homosexuality/timeline.htm>.
    Accessed 5 March 2011.........................................................16, 18, 20

Painter, George.  Sodomy Laws.
    <http://www.glapn.org/sodomylaws/history/history12.htm>.
    Accessed 4 March 2011.........................................................22

Polybius, *The Histories*, Book 6, Ch. 37.
    <http://www.perseus.tufts.edu/hopper/text?doc=Perseus%3
    Atext%3A1999.01.0234%3Abook%3D6%3Achapter%3D37>.
    Accessed 5 March 2011.........................................................18

W. B. Yeats, "The Second Coming," (1919).........................................................3

### Rules

Fed. R. App. P. 26.1.................................................................... v

Fed. R. App. P. 29(c).................................................................... v

Fed. R. App. P. 32(a).................................................................... 27

Fed. R. App. P. 32(a)(5).................................................................... 27

Fed. R. App. P. 32(a)(6).................................................................... 27

Fed. R. App. P. 32(a)(7)(B) ..................................................................27

Fed. R. App. P. 32(a)(7)(B)(iii) ...........................................................27

## STATEMENT OF IDENTITY AND INTEREST OF THE TRADITIONALIST YOUTH NETWORK, LLC

The Traditionalist Youth Network, LLC, is a limited liability corporation existing by and through the laws of the State of Michigan, and it is nationally recognized as a staunch advocate of traditionalism. Its members have engaged in political discourse and have promoted traditionalism by publishing commentary on the organization's website—www.TradYouth.org—, by organizing and participating in public demonstrations, and by being invited to and speaking at events organized by other similarly-minded organizations.

Even though the Traditionalist Youth Network, LLC, was only founded as recently as July of 2013, it has quickly become one of the fiercest defenders of traditional values in the United States of America—its members have appeared in televised national news stories and people throughout the country have expressed an interest in creating chapters of the organization in their own states.

In short, the Traditionalist Youth Network, LLC, is to the United States of America what Génération Identitaire is to France: it is an extremely active pro-European socio-political identity movement that was founded and is controlled by concerned and well-informed young activists.

As an organization that vigorously advocates traditionalism, the Traditionalist Youth Network, LLC, strongly opposes any attempt to usurp the

sanctity of marriage through the debasement of this ancient artifact of Western civilization.

Traditionalist Youth Network, LLC, has been granted leave by the United States Court of Appeals for the Sixth Circuit to file this *amicus curiae* brief.

## SUMMARY OF ARGUMENT

This *amicus curiae* brief argues that the State of Michigan has a legitimate state interest to ban same-sex marriage, and that Mich. Const. Art. I, § 25 is rationally related to said legitimate interest.

The reason why banning same-sex marriage is a legitimate state interest is because the State of Michigan's inherent police powers authorize the government to promote the health, safety, morals, and public welfare of its people, and it is respectfully submitted that same-sex marriage is an affront to the health, safety, morals, and public welfare of the residents of the State of Michigan—which is why the Western and American legal traditions have proscribed sodomy—much less same-sex marriage—for thousands and hundreds of years, respectively.

## STATEMENT OF FACTS

In November of 2004, the voters of Michigan approved a constitutional amendment to ban same-sex marriage.  Mich. Const. Art. I, § 25 ("To secure and preserve the benefits of marriage for our society and for future generations of

children, the union of one man and one woman in marriage shall be the only

agreement recognized as a marriage or similar union for any purpose.").

Plaintiffs-Appellees April DeBoer and Jayne Rowse are in a same-sex

relationship and challenged the constitutionality of this constitutional amendment,

and the United States District Court for the Eastern District of Michigan

incorrectly ruled that the constitutional amendment is unconstitutional per the

Fourteenth Amendment to the United States Constitution insofar as it does not pass

even rational basis review.

## ARGUMENT

> Turning and turning in the widening gyre
> The falcon cannot hear the falconer;
> Things fall apart; the centre cannot hold;
> The blood-dimmed tide is loosed, and everywhere
> The ceremony of innocence is drowned;
> The best lack all conviction, while the worst
> Are full of passionate intensity.

W. B. Yeats, "The Second Coming," (1919).

Nothing better than the first paragraph of Yeats' famous poem can describe

the magnitude and radical ramifications if the judgment of the district court is not

overturned.  Whereas sodomy was abhorred throughout Western and American

history—and was permitted to be criminalized from time immemorial until *Bowers*

*v. Hardwick*, 478 U.S. 186 (1986) was reversed roughly a decade ago per

*Lawrence v. Texas*, 539 U.S. 558 (2003)—, it is now so chic that its activists have

3

been able to convince learned jurists to normalize it by ordering that those who practice sodomy be permitted to marry one another.

Either government can reasonably regulate marriage, or it cannot—there is no middle ground. If a state cannot be permitted to define marriage as simply as constituting one man and one woman, then our culture will be taken down a very slippery slope that will see pedophiles, polygamists, zoophiles, those in incestuous relationships, and every other sexual deviant with proclivities now known or to be invented to challenge laws that, likewise, prevent them from marrying whom—or what—they wish.

As will be demonstrated *infra*, the State of Michigan has a legitimate state interest to ban same-sex marriages, and the State of Michigan's ban on same-sex marriages is reasonably related to said legitimate interest.

## I. THE DISTRICT COURT ERRED BY HOLDING THAT THE STATE OF MICHIGAN'S BAN ON SAME-SEX MARRIAGE DOES NOT SATISFY RATIONAL BASIS REVIEW.

The Fourteenth Amendment to the United States Constitution prohibits a state from denying to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1. When a law is alleged to violate the Fourteenth Amendment by infringing upon a suspect class—such as one's race, ethnicity, or religion—, strict scrutiny review of the law is to be applied. *Korematsu v. United States*, 323 U.S. 214, 216 (1944). When discrimination is

occurring based upon a quasi-suspect class—gender, alienage, or illegitimacy—, intermediate scrutiny is utilized. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). When neither a suspect nor quasi-suspect class is involved through the enforcement of a law, then mere rational basis review is to be utilized. *United States v. Carolene Products Co.*, 304 U.S. 144 (1938).

When rational basis review is used to determine whether a law is constitutional, the party challenging the constitutionality of the law bears the burden of showing that the state has no legitimate state interest to which the law is rationally related. *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).

The United States Court of Appeals for the Sixth Circuit does not consider homosexuals to be a suspect or quasi-suspect class. *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012); *Scarborough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006). As such, mere rational basis review is to be applied to determine whether Mich. Const. Art. I, § 25 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## A. The State Of Michigan Has A Legitimate State Interest To Ban Same-Sex Marriage.

As mentioned *supra*, prior to *Lawrence v. Texas* in 2003, laws that criminalized acts of sodomy were constitutional per United States Supreme Court case law. See, e.g., *Bowers*, supra.

In *Lawrence*, John Lawrence was arrested in Houston, Texas, for engaging in acts of sodomy with another man in violation of Texas state law, held in custody overnight, charged with having violated that law, and was convicted before a justice of the peace. *Lawrence* at 562-63. After he was convicted, Lawrence appealed to the Court of Appeals for the Texas Fourteenth District on the grounds that his equal protection and due process rights pursuant to the Fourteenth Amendment were violated by the state law that criminalized sodomy. The appellate court rejected Lawrence's arguments and affirmed the conviction. *Id*. at 563. After that, he petitioned the United States Supreme Court to review his case, and the justices chose to do so. In the opinion of the court, the justices held that American citizens enjoy a due process right to engage in homosexual conduct within the privacy of their homes. *Id*. at 578 ("The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.").

The *Lawrence* holding was as revolutionary as it was legally unjustified. With a majority ruling that asserts for all intents and purposes that sodomy is a right, *Lawrence* achieved what legal scholar and originalist theorist Robert Bork considers to be the normalization of homosexuality. Bork, Robert. *Slouching*

*Towards Gomorrah:  Modern Liberalism and American Decline*.  New York City: ReganBooks/HarperCollins Publishers, Inc., 2003.  p. 366.  Bork observed that *Lawrence* "effectually made homosexual sodomy a constitutional right by means of an argument that owes nothing to law but everything to a subsophomoric moral argument."  *Id.* at 364.  Conservative activist and attorney Phyllis Schlafly echoed Bork's sentiments in her book that chronicles the politicization of the United States Supreme Court in recent years.  Schlafly, Phyllis.  *The Supremacists:  The Tyranny of Judges and How to Stop It*.  Dallas, Texas:  Spence Publishing Company, 2006.  p. 45.  ("The out-of-the-mainstream attitudes expressed in the majority opinion in *Lawrence v. Texas* dealt a devastating blow to long-standing American laws and beliefs about morals and self-government, striking down our right to legislate against immoral actions, and doing so without advancing any argument that reasonably relates to the U.S. Constitution.  No constitutional argument justified the decision that created the new right to sodomy.")

For the *Lawrence* decision, the revolutionary nature of it was called out by the three dissenting justices.  Justice Antonin Scalia dissented with Justice Clarence Thomas and Chief Justice William Rehnquist, and Justice Scalia opined with regards to the ruling, "It is clear from this that the Court has taken sides in the culture war, departing from its role of assuring, as neutral observer, that the

democratic rules of engagement are observed." *Lawrence* at 602 (Scalia, J., joined

by Rehnquist, C.J., and Thomas, J., dissenting).  Justice Scalia also added,

> Today's opinion is the product of a Court, which is the product of a
> law-profession culture, that has largely signed on to the so-called
> homosexual agenda, by which I mean the agenda promoted by some
> homosexual activists directed at eliminating the moral opprobrium
> that has traditionally attached to homosexual conduct.

*Id.*

Just seventeen years before *Lawrence* was decided and same-sex sodomy

was deemed a constitutionally-protected right, the Supreme Court reviewed a case

that was very similar to the facts involved in *Lawrence*, but this time the majority

of the justices held that states may criminalize sodomy because it is not a

constitutionally-protected right.  In his dissenting opinion in *Lawrence*, Justice

Scalia lambasted the justices who were "manipulative" rather than "consistent" in

applying the law.  *Id.* at 587-88 (Scalia, J., joined by Rehnquist, C.J., and Thomas,

J., dissenting).

The case that was reviewed by the Supreme Court seventeen years before

*Lawrence* was *Bowers*, and in this case,

> the Supreme Court held that the right to privacy does not protect a
> right to engage in private consensual homosexual activity.  In a 5-4
> decision, the Court upheld a Georgia law that prohibited oral-genital
> or anal-genital contact. . . . The Court said that such a right did not
> exist because it was not supported by the Constitution's text, the
> framers' intent, or tradition.

Chemerinsky, Erwin. *Constitution Law*. Third ed. New York City: Aspen, 2009.  p. 1056.

In *Bowers*, Michael Hardwick was charged with breaking a Georgia state law that criminalized sodomy; the crime occurred in the privacy of his home. *Bowers* at 187-88.  Justice Byron White authored the majority opinion, and he rejected Hardwick's request that the Supreme Court recognize sodomy as a constitutionally-protected right on the basis that history does not evince a due process right for people to engage in acts of sodomy:

> Nor are we inclined to take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause. The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.

*Bowers* at 194.

Chief Justice Warren Burger concurred with the majority opinion in *Bowers*, and he did so in order to stress "that in constitutional terms there is no such thing as a fundamental right to commit homosexual sodomy."  *Id.* at 196 (Burger, C.J., concurring).

The issue presented in the appeal for the case at bar is not complicated: whether a state may, pursuant to its inherent police power, regulate marriage in a way that does not affect a suspect or quasi-suspect class.

9

Not satisfied with exercising their newfound right in private, homosexuals have come out of the closet and into the courtroom in attempt to further normalize their conduct by demanding more rights that are not in accordance with history. Amazingly, the Culture distorters have marched forward so relentlessly in the culture war that sodomy has not only been legalized, but now those who practice sodomy are demanding to be permitted to marry one another—which the United States District Court for the Eastern District of Michigan was happy to oblige.

Constitutional law scholars Steven Calabresi and Sarah Agudo have explored what rights American citizens enjoyed when the Fourteenth Amendment was ratified in 1868.  Steven Calabresi and Sarah Agudo.  "Individual Rights Under State Constitutions when the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?"  87 Tex. L. Rev. 7 (2008).  In their law review article, they observe that "the Fourteenth Amendment protects both enumerated and unenumerated rights so long as those rights are deeply rooted in history and tradition."  *Id.* at 11.

Traditionalism should not simply be disregarded when a Court contemplates the constitutionality of a law.  See, e.g., *Michael H. v. Gerald D.*, 491 U.S. 110, 122-23 (1998) (citing *Griswold v. Connecticut*, 381 U.S. 479, 501 (1965) (Harlan, J., concurring) ("Our cases reflect 'continual insistence upon respect for the teachings of history [and] solid recognition of the basic values that underlie our

society. . . .').  The reason why traditionalism is important to jurisprudence was best explained by Justice White:

> That the Court has ample precedent for the creation of new constitutional rights should not lead it to repeat the process at will. The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution.  Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers . . ., the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare.  Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority.

*Moore v. East Cleveland*, 431 U.S. 494, 544 (1977) (White, J., dissenting).

As is set forth *infra*, homosexual conduct has historically not been tolerated by the Western and American legal traditions, and as such, there is no genuine basis by which it can be argued that the Fourteenth Amendment to the United States Constitution recognizes the right for homosexuals to marry one another.

The trial court for the instant case was dismissive of tradition in its opinion when it favorably cited *Heller v. Doe*, 509 U.S. 312, 326 (1993) ("[a]ncient lineage of a legal concept does not give it immunity from attack for lacking a rational basis.")  However, another federal court has ruled as recently as 2012 that protecting the traditional institution of marriage is a legitimate state interest. *Sevcik v. Sandoval*, 911 F.Supp.2d 996 (D.Nev. 2012).  Said the *Sevcik* court:

The protection of the traditional institution of marriage, which is a conceivable basis for the distinction drawn in this case, is a legitimate state interest. Although traditional disapproval is not alone a valid state interest for prohibiting private, consensual activity, *see Lawrence*, 539 U.S. at 577-78, 123 S.Ct. 2472 (quoting *Bowers*, 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting)), civil marriage is at least partially a public activity, and preventing "abuse of an institution the law protects" is a valid state interest, *see id.* at 567, 123 S.Ct. 2472. More specifically:

> That [the Texas anti-sodomy law] as applied to private, consensual conduct is unconstitutional under the Equal Protection Clause does not mean that other laws distinguishing between heterosexuals and homosexuals would similarly fail under rational basis review. Texas cannot assert any *legitimate state interest* here, *such as* national security or *preserving the traditional institution of marriage*. Unlike the moral disapproval of same-sex relations—the asserted state interest in this case—*other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group*. *Id.* at 585, 123 S.Ct. 2472 (O'Connor, J., concurring in the judgment) (emphasis added).

*Id.* at 1014-15.

The *Sevcik* court upheld the State of Nevada's ban on same-sex marriages after stating quite clearly in its opinion that government has a legitimate state interest to ban such forms of marriages:

> As Justice O'Connor noted in concurrence in *Lawrence,* there are additional reasons to promote the traditional institution of marriage apart from mere moral disapproval of homosexual behavior, and these reasons provide a rational basis for distinguishing between opposite-sex and same-sex couples in the context of civil marriage. Human beings are created through the conjugation of one man and one woman. The percentage of human beings conceived through non-traditional methods is minuscule, and adoption, the form of child-

12

rearing in which same-sex couples may typically participate together, is not an alternative means of creating children, but rather a social backstop for when traditional biological families fail. The perpetuation of the human race depends upon traditional procreation between men and women. The institution developed in our society, its predecessor societies, and by nearly all societies on Earth throughout history to solidify, standardize, and legalize the relationship between a man, a woman, and their offspring, is civil marriage between one man and one woman. *See Maynard v. Hill,* 125 U.S. 190, 211, 8 S.Ct. 723, 31 L.Ed. 654 (1888) (" It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress."). [Footnote omitted]  Should that institution be expanded to include same-sex couples with the state's imprimatur, it is conceivable that a meaningful percentage of heterosexual persons would cease to value the civil institution as highly as they previously had and hence enter into it less frequently, opting for purely private ceremonies, if any, whether religious or secular, but in any case without civil sanction, because they no longer wish to be associated with the civil institution as redefined, [footnote omitted] leading to an increased percentage of out-of-wedlock children, single-parent families, difficulties in property disputes after the dissolution of what amount to common law marriages in a state where such marriages are not recognized, or other unforeseen consequences. *See Jackson,* 884 F.Supp.2d at 1112-15. Because the family is the basic societal unit, the State could have validly reasoned that the consequences of altering the traditional definition of civil marriage could be severe. *See id.* at 1117 (" [I]t is not beyond rational speculation to conclude that fundamentally altering the definition of marriage to include same-sex unions might result in undermining the societal understanding of the link between marriage, procreation, and family structure." ).

*Id.* at 1015-16.

Likewise, the argument that the Fourteenth Amendment to the United States Constitution guarantees a right for homosexuals to enter into same-sex marriages was wholeheartedly rejected in *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971),

*appeal dismissed*, 409 U.S. 810 (1972). Since *Baker* came to the United States

Supreme Court not through *certiorari* but by mandatory appellate review, the

dismissal of *Baker* creates binding case law on lower courts. *See, e.g., Jackson v.*

*Abercrombie*, 884 F.Supp.2d 1065, 1070 (D.Hawai'i 2012) ("For the reasons set

forth herein, Plaintiff's claims are foreclosed by the Supreme Court's summary

dismissal for want of a substantial federal question in *Baker v. Nelson*, 409 U.S.

810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972) (mem.)."); *Smelt v. County of Orange*, 374

F.Supp.2d 861, 872 (C.D.Cal. 2005) ("A dismissal for want of substantial federal

question is a decision on the merits that is binding on lower courts. *Hicks v.*

*Miranda*, 422 U.S. 332, 344-45, 95 S.Ct. 2281, 45 L.Ed. 223 (1975).").

As shown *infra*, the tradition of the institution of marriage is now under

attack by a segment of the population that engages in conduct that is criminal as far

as the Western and American legal traditions are concerned.

## 1. The State Of Michigan's Ban On Same-Sex Marriage Is In Accordance With the Western Legal Tradition.

The reason why same-sex marriage does not exist throughout the history of

Western civilization is because Western civilization has not only not recognized

such marriages, but has gone so far as to criminalize same-sex acts. Since one

cannot explore how the Western legal tradition dealt with same-sex marriage since

homosexuality was not tolerated whatsoever, one can only delve into how the

Western legal tradition generally views homosexuals.

14

Said Chief Justice Burger in *Bowers*,

[T]he proscriptions against sodomy have very "ancient roots."
Decisions of individuals relating to homosexual conduct have been
subject to state intervention throughout the history of Western
civilization.  Condemnation of those practices is firmly rooted in
Judeo-Christian moral and ethical standards.  Homosexual sodomy
was a capital crime under Roman law. . . . During the English
Reformation when powers of the ecclesiastical courts were transferred
to the King's Courts, the first English statute criminalizing sodomy
was passed. . . . [Well-respected English judge Sir William]
Blackstone described "the infamous *crime against nature*" as an
offense of "deeper malignity" than rape, a heinous act "the very
mention of which is a disgrace to human nature," and "a crime not fit
to be named."

*Bowers* at 197 (Burgers, C.J. concurring).

Chief Justice Burger's findings are not an anomaly, for in 2002, Chief
Justice Roy Moore of the Alabama Supreme Court wrote a concurring opinion for
*Ex parte H.H.* in which he observed how homosexual conduct has been
criminalized throughout history and in the Old Testament of the Bible, which is
from where Western countries derive many legal principles.  *Ex parte H.H.*, 830
So. 2d 21, 33-34 (Ala. 2002) (Moore, C.J., concurring) ("Homosexuality is
strongly condemned in the common law because it violates both natural and
revealed law.  The author of Genesis writes:  'God created man in His own image,
in the image of God He created him; male and female He created them. . . . For this
reason a man shall leave his father and his mother, and be joined to his wife; and
they shall become one flesh.'  Genesis 1:27, 2:24 (King James).  The law of the

Old Testament enforced this distinction between the genders by stating that 'if a man lies with a male as he lies with a woman, both of them have committed an abomination.' Leviticus 20:13 (King James). From the passage in Leviticus 20:13, the early western legal tradition garnered its laws on homosexuality.").

Chief Justice Roy Moore also recounted in his concurrence how "In the Middle Ages, St. Thomas Aquinas, a preeminent disciple of natural-law theory, called homosexuality 'contrary to right reason' and 'contrary to the natural order.'" *Id.* at 34.

Opposition to sodomy is not unique to Christendom and Judaism as recounted by Chief Justice Moore, because the pre-Christian Romans also passed laws that criminalized it. Around 149 B.C., the Roman Republic implemented laws that criminalized immoral activities through what was called the *Lex Scantinia*. Frakes, Robert. Why the Romans Are Important in the Debate About Gay Marriage. History News Network. <http://hnn.us/articles/21319.html>. Accessed 5 March 2011. ("Although there is scholarly debate, Roman literature of the republic and early empire suggests that men who engaged in consensual liaisons were often mocked as unmanly.") By way of this legal code, free-born men who engaged in sodomy faced the death penalty. Timeline of Homosexuality. Religion Facts. <http://www.religionfacts.com/homosexuality/timeline.htm>. Accessed 5 March 2011. Although some Greek city-states—such as Athens—had

no qualms with sodomy, virtually all other European regimes throughout history

have found the practice repugnant.  Robert Frakes, a professor of history and

author of Contra Potentium Iniurias: The Defensor Civitatis and Late Roman

Justice, noted,

> Romans in the period of the Roman Republic and early empire tended
> to perceive the Greek acceptance of male homosexuality as less than
> male and, thus, literally unvirtuous (*Vir* being the Latin word for
> man).  Indeed, a Roman term for effeminacy was "*Graeculus*"—"a
> little Greek!"

> The earliest Roman law regarding homosexuality appears to have
> been the *Lex Scantinia* that was passed by the Roman assembly at
> some point in the Roman Republic (perhaps in the second century
> B.C.).  Although the text of this law itself has not survived, later
> Roman jurists of the second and third century A.D. describe how it
> outlawed the homosexual rape of young male Roman citizens.

Frakes.

In the 2nd century B.C., the Greek historian Polybius observed that by

Roman law, soldiers caught engaging in sodomy were made to run through a

gauntlet as they were stoned to death and beaten with clubs:

> Then the Tribunes at once hold a court-martial, and the man who is
> found guilty is punished by the fustuarium; the nature of which is this.
> The Tribune takes a cudgel and merely touches the condemned man;
> whereupon all the soldiers fall upon him with cudgels and stones.
> Generally speaking men thus punished are killed on the spot; but if by
> any chance, after running the gauntlet, they manage to escape from
> the camp, they have no hope of ultimately surviving even so. . . . The
> punishment of the fustuarium is assigned . . . to any one . . . who in
> full manhood is detected in shameful immorality [i.e. having engaged
> in homosexual conduct].

Polybius, *The Histories*, Book 6, Ch. 37.

<http://www.perseus.tufts.edu/hopper/text?doc=Perseus%3Atext%3A1999.01.023

4%3Abook%3D6%3Achapter%3D37>.  Accessed 5 March 2011.

After the Roman Republic was transformed into the Roman Empire, and

after the Roman Empire embraced Christianity, the Romans reaffirmed through

law their commitment to prohibiting sodomy.  Frakes.  ("Most scholars interpret a

convoluted law from the year 342 A.D. surviving in both the *Theodosian Code* and

the *Code of Justinian* as a decree from the emperors Constantius II and Constans

that marriage based on unnatural sex should be punished meticulously.  Although

Constans himself was later denounced as having male lovers, this trend of the

emperors in condemning male homosexuality in laws would continue.  In a law of

390 A.D., surviving in the *Theodosian Code* and the *Lex Dei* ("Law of God"), the

emperors Valentinian, Theodosius, and Arcadius ordained that any man taking the

role of a woman in sex would be publicly burned to death.")  Also, in 438 A.D.,

Emperor Theodosius II ordered the death penalty for those who engage in

homosexual conduct.  *Timeline of Homosexuality*.

The Romans were not the only Western people to have criminalized

sodomy, for during the 1st millennium A.D., the pre-Christian Germanic tribes also

criminalized it.  The Roman historian Tacitus published in 98 A.D. a text called

*Germania* that detailed the Germanic way of life.  In the twelfth chapter of his

work, he wrote,

> In their councils an accusation may be preferred or a capital crime
> prosecuted. Penalties are distinguished according to the offence.
> Traitors and deserters are hanged on trees; the coward, the unwarlike,
> the man stained with abominable vices [i.e., homosexual conduct], is
> plunged into the mire of the morass, with a hurdle put over him.  This
> distinction in punishment means that crime, they think, ought, in
> being punished, to be exposed, while infamy ought to be buried out of
> sight.

Tacitus.  *Germania*.

<http://www.perseus.tufts.edu/hopper/text?doc=Tac.+Ger.+12&fromdoc=Perseus

%3Atext%3A1999.02.0083>.  Accessed 8 May 2010.

Researcher Jim Steakley observed Tacitus' understanding of Germanic law

with regards to sodomy when he noted that the ancient Germans considered

homosexuality to warrant death by drowning in a swamp.  Steakley, Jim.  *Timeline*

*of German LGBT History*.

<http://www.gsaforsafeschools.org/history/German_TL_Student_Teach.pdf>.

Accessed 5 March 2011. ("The Roman historian Tacitus reports that the Germanic

tribes execute homosexuals (*corpores infames*, "those who disgracefully abuse

their bodies") and sink them into swamps.  Remains of several such corpses have

been found in the peat bogs of Denmark and northern Germany and are now

exhibited in museums.  Some had been strangled to death prior to being sunk in the

bogs, while others were apparently drowned alive.")  Even when the Germanic

peoples were Christianized, they still clung to their practice of drowning sodomites in swamps. *Id.* ("[In around 500 A.D.,] the Germanic tribes living south of Scandinavia gradually convert to Christianity and find their homophobic outlook confirmed by the Roman Catholic condemnation of homosexuality. Yet the Germans do not adopt the church-inspired edicts promulgated in 342 and 390 by Christian Roman emperors, who had called for burning homosexuals at the stake. Instead, the Germans maintain their own legal practices, which rely on oral tradition.")

The Germanic and Roman peoples were not the only Europeans who thought poorly of sodomy, for the pre-Christian Norse were also vehemently opposed to it. Steakley said of this society that

> In still-pagan Viking society, calling a man a homosexual (*arg*, "effeminate, cowardly") is a slur that requires the offended individual to challenge his insulter to a duel. Failure to respond to the libel brings not just dishonor but also the legal status of "outlawry," which allows anyone to stalk and slay the insulted man without penalty.

*Id.*

Opposition to sodomy was not limited to Scandinavia, Germania, and the Roman Empire, for it was also criminalized throughout the Byzantine Empire in the east. In 535 A.D., Byzantine Emperor Justinian's *Novella* outlawed sodomy and called for the death penalty for those who engaged in it. *Timeline of Homosexuality*.

20

European peoples throughout the Middle Ages also viewed sodomy as a crime. Around 800 A.D., the Holy Roman Empire enacted laws that punished those who engaged in it. *Id.* In 1328 A.D.—five hundred years after the Holy Roman Empire first enacted laws that proscribed sodomy—the Germans were still punishing the crime with capital punishment, and in 1530 A.D., the Holy Roman Empire slightly adjusted its anti-sodomy law by prescribing death by being burned alive at the stake for those convicted of that crime. Steakley. ("Paragraph 132 of the German *Law Book for Town and Country* calls for burning at the stake all lesbians and gay men ("those who mix with the same sex"). In practice, a milder sentence is at times meted out, especially to aristocrats: rapid execution (decapitation by sword) followed by burning. In most cases, all documents concerning the trial are also burned to expunge every trace of the deed, whose very mention is labeled sinful. Sodomy, a word not to be uttered among Christian folk, is linked with heresy."). *Id.* ("Burning at the stake is confirmed as the punishment for "unchasteness against nature, man with man, woman with woman" in the *Carolina*, the first printed German criminal code that aspire[ed] to the comprehensiveness of ancient Roman law. [*Carolina* was enforced] throughout the Holy Roman Empire. . . .")

**2. The State Of Michigan's Ban On Same-Sex Marriage Is In Accordance With The American Legal Tradition.**

For the United States, its anti-sodomy laws throughout its existence have been in accordance with Western history. Not surprisingly, until 1961 A.D., all fifty American states outlawed sodomy. *Bowers* at 193.

Justice Kennedy observed in *Lawrence* that "Beginning in colonial times there were prohibitions of sodomy derived from the English criminal laws passed in the first instance by the Reformation Parliament of 1533 A.D." *Lawrence* at 568. During the colonial period, records exist which show that twenty people were prosecuted for sodomy—four of whom were executed. *Id.* at 597 (Scalia, J., joined by Rehnquist, C.J. and Thomas, J., dissenting).

Even some of our nation's Founding Fathers viewed sodomy to be repugnant and warranting punishment. Thomas Jefferson, for example, wrote a proposed law which called for homosexuals to be mutilated. Jefferson, Thomas. *The Founders' Constitution, Volume 5, Amendment VIII, Document 10*. <http://press-pubs.uchicago.edu/founders/documents/amendVIIIs10.html>. Accessed 5 March 2011. ("Whosoever shall be guilty of Rape, Polygamy, or Sodomy with man or woman shall be punished, if a man, by castration, if a woman, by cutting thro' the cartilage of her nose a hole of one half inch diameter at the least.") Jefferson's proposed law was rejected by the committee that was tasked with revising criminal law for Virginia, because the committee decided to instead retain the traditional punishment for sodomy: the death penalty. Painter, George. Sodomy Laws.

<http://www.glapn.org/sodomylaws/history/history12.htm>.     Accessed  4  March 2011.

As the leader of the Continental Army in 1778, General George Washington dishonorably discharged a soldier who attempted to engage in sodomy.   Gen. Washington's military order stated in part,

> His Excellency the Commander in Chief approves the sentence and with abhorrence and detestation of such infamous crimes orders Lieut. Enslin to be drummed out of camp tomorrow morning by all the drummers and fifers in the Army never to return.

Brief for the Center for the Original Intent of the Constitution Supporting Respondent, Lawrence v. Texas, 539 U.S. 558 (2003) (No. 02-102).

In their *amicus curiae* brief to the Supreme Court for *Bowers*, the Concerned Women for American Education and Legal Defense Foundation observed,

> The historical case in favor of state criminal sodomy laws is overwhelming.  All of the 13 original states had criminal sodomy laws, most of them punishing sodomy with death. . . .
>
> Every state that entered the union after 1868 passed a criminal sodomy law.  For most of American history, all states have had criminal sodomy laws. . . . No state supreme court declared a criminal sodomy statute unconstitutional on a right of privacy basis until 1980, which is almost 200 years after ratification of the Bill of Rights and 112 years after ratification of the 14th Amendment.

Brief for Concerned Women for American Education and Legal Defense Foundation as Amici Curiae Supporting Petitioners, Bowers v. Hardwick, 478 U.S. 186 (1986) (No. 85-140).

23

In 1921, the Florida Supreme Court reviewed a case in which the petitioners were indicted for and convicted of the "abominable and detestable crime against nature" and were sentenced to five years of imprisonment. *Ephraim v. State*, 89 So. 344 (Fla. 1921). The justices agreed only to review the case because "The creatures who are guilty are entitled to a consideration of their case because they are called human beings and are entitled to the protection of the laws." *Id.* at 344-45. In their opinion, the justices of the Florida Supreme Court stated that

> The punishment at common law for such offence . . . was death, sometimes burning alive. . . . But such punishment has been modified by people of later times, not that the crime is less repulsive now, but perhaps out of human consideration for the creatures whose law moral and intellectual standard entitles them to a kind of pity.

*Id.*

Chief Justice Moore was correct when he noted in *Ex parte H.H.*, "No matter how much society appears to change, the law on this subject has remained steadfast from the earliest history of the law. . . ." *Ex parte H.H.* at 35 (Moore, C.J., concurring).

## B. The State Of Michigan's Ban On Same-Sex Marriage Is Rationally Related To The Legitimate State Interest To Ban Same-Sex Marriage.

For the reasons set forth *supra*, the State of Michigan has a legitimate state interest to proscribe by law same-sex marriage. Due to the plain language of Mich. Const. Art. I, § 25, it is clear that the constitutional amendment is rationally related

to this legitimate state interest.  As such, the constitutional amendment is constitutional as a matter of law.

## CONCLUSION

For the reasons set forth *supra*, this Court should reverse the judgment of the district court.  It is simply unfathomable to postulate that the Fourteenth Amendment to the United States Constitution prevents states from banning same-sex marriages when the totality of the history of the Western and American legal traditions demonstrates quite clearly that same-sex conduct can be penalized. *Lawrence* is radically wrong, but legalizing same-sex marriage through judicial opinion is offensively absurd.

It is high time for the mockery of our ancient and traditional European institutions and customs to end.

Respectfully submitted,


/s/ Kyle J. Bristow_____
Kyle J. Bristow, Esq.
Bristow Law, PLLC
P.O. Box 1954
Clarkston, MI 48347
(P):  (567) 694-5953
(E):  BristowLaw@gmail.com
Ohio S. Ct. #0089543
Mich. State Bar #P77200
*Lead Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

and

25

Jason Van Dyke, Esq.
The Van Dyke Law Firm, PLLC
200 Chisholm Pl., #250
Plano, TX 75075
(P):  (469) 964-5346
(F):  (972) 421-1830
Tex. State Bar #24057426
*Co-Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

Dated:  March 25, 2014

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)</u>

This is to certify that this *amicus curiae* brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 6084 words, exclusive of the parts of this brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).

This brief has been prepared in a proportionally spaced typeface—Times New Roman 14-point font—by using Microsoft Word 2013.

/s/ Kyle J. Bristow_____
Kyle J. Bristow, Esq.
Bristow Law, PLLC
P.O. Box 1954
Clarkston, MI 48347
(P): (567) 694-5953
(E): BristowLaw@gmail.com
Ohio S. Ct. #0089543
Mich. State Bar #P77200
*Lead Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

Dated: March 25, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2014, the foregoing *Amicus Curiae* Brief

of Traditionalist Youth Network, LLC, in Support of Appellants and Urging

Reversal was filed electronically though the Court's CM/ECF system.  Notice of

this filing should be sent through said electronic filing program to the attorneys of

record for the parties.

/s/ Kyle J. Bristow
Kyle J. Bristow, Esq.
Bristow Law, PLLC
P.O. Box 1954
Clarkston, MI 48347
(P):  (567) 694-5953
(E):  BristowLaw@gmail.com
Ohio S. Ct. #0089543
Mich. State Bar #P77200
*Lead Counsel for Amicus Curiae*
*Traditionalist Youth Network, LLC*

Dated:  March 25, 2014